## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                    No. CR 07-1180 JB

OSCAR MOYA-MATUTE,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress and Memorandum in Support Thereof, filed July 4, 2007 (Doc. 16).  The Court held an evidentiary hearing on the motion on October 29, 2007.    The primary issues are: (i) whether the interaction among Senior Border Patrol Agent Brian Knoll, Immigration Enforcement Agent Mike Underdown, and Defendant Oscar Moya-Matute was a consensual encounter; (ii) whether the agents had reasonable suspicion to subject Moya-Matute to an investigatory detention; and (iii) whether there was probable cause to arrest Moya-Matute.  Because the Court finds that the encounter between the agents and Moya-Matute was consensual, and finds that the agents had probable cause to arrest Moya-Matute, the Court will deny the Defendant's Motion to Suppress.

## <u>FINDINGS OF FACT</u>

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules

of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982). cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      Moya-Matute was born in and is a citizen of Honduras.  See  Transcript of Hearing at 71:5-8 (taken October 29, 2007)("Tr.")(Brawley & Moya-Matute).[1]

2.      Underdown works as an immigration enforcement agent through the Department of Homeland Security with Immigration and Customs Enforcement ("ICE").  See Tr. at 3:20-24 (Brawley & Underdown).

3.      ICE has employed Underdown for a year and four months.  See Tr. at 3:25-4:3 (Brawley & Underdown).

4.      Part of Underdown's job as team captain is to interview people in jail to ascertain their immigration status in the United States.  See Tr. at 4:13-22 (Brawley & Underdown).

5.      Underdown has previous law enforcement experience with the military police, where he was assigned to presidential detail, traveled with Presidents Bush and Clinton as security, and set up local liasons with other law enforcement.  See Tr. at 5:1-9 (Brawley & Underdown).

6.      Underdown also has previous experience working as security at a nuclear-power plant in Louisiana.  See Tr. at 5:1-9 (Brawley & Underdown).

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

7.      Underdown has received training at the military police academy, Border Patrol, and Wackenhut; he received Fourth-Amendment search-and-seizure training. See Tr. at 5:21-6:13 (Brawley & Underdown).

8.      Underdown has also had on-the-job training with encounters on buses. See Tr. at 10:10-13 (Underdown).

9.      Underdown estimates that he has arrested over one-hundred people. See Tr. at 10:18-20 (Brawley & Underdown).

10.     Underdown is not a fluent Spanish speaker, but can understand basic questions in Spanish. See Tr. at 27:12-14 (Underdown).

11.     For approximately three months before April 5, 2007, agents Knoll and Underdown went to the Greyhound bus station in Albuquerque, New Mexico nearly everyday because, based on their training and experience, they knew the bus station to be a staging area for undocumented aliens passing through to other parts of the United States. See Tr. at 11:17-12:1 (Underdown & Brawley); id. at 33:23-25 (Underdown).

12.     Underdown was familiar with Albuquerque being a "hub" and the bus station as a "staging area" for undocumented aliens passing through to other parts of the United States for several years before he began working with Knoll. See Tr. at 8:15-23 (Underdown).

13.     Underdown believes that undocumented individuals choose buses for transportation because there is less security and because it is not necessary to present a passport. See Tr. at 11:6-10 (Underdown).

14.     Knoll had been going to the bus station in Albuquerque on a daily basis much longer than three months before April 5, 2007. See Tr. at 12:11-15 (Brawley & Underdown).

15.     Before April 5, 2007, Knoll and Underdown, however, had only worked together for

three months.  See id.

16.     Knoll and Underdown employed a standard practice on each of their visits to the bus station.  See Tr. at 14:5-15:6 (Brawley & Underdown).

17.     Knoll and Underdown would go to the bus station to speak with as many people as possible.  See at 14:7 (Underdown).

18.     Knoll and Underdown typically tried to arrive early so that they could speak with the bus passengers before the passengers got off of the buses.  See Tr. at 14:1-2 (Underdown).

19.     If the people were still on the bus when Underdown and Knoll got there, they then would board the bus.  See Tr. at 14:16-17 (Underdown).

20.     When they boarded the bus, Knoll would give a speech about "who [they] were, what [they] were doing there, and get everybody to show [a] driver's license [of] some kind .  .  . when they exit the bus.  So [they would] talk to everybody that was getting off of the busses coming inbound."  Tr. at 14:18-21 (Underdown).

21.     Knoll and Underdown sometimes, however,  arrived at the bus station, after the people were off of the bus.  See Tr. at 14:9-10 (Underdown).

22.     When Knoll and Underdown arrived after the passengers were off of the bus, the agents would speak with everyone.  See Tr. at 20:19-20 (Brawley & Underdown).

23.     The agents tried to talk to everyone, regardless of how the individual people looked or what language they seemed to speak.  See Tr. at 21:16-21 (Brawley & Underdown).

24.     Knoll and Underdown did not target individuals "that looked like they may have some kind of Hispanic heritage."  Tr. at 21:16-18 (Brawley & Underdown).

25.     When the agents encountered people, either on a bus or in the bus terminal, they always greeted the people in English.  See Tr. at 22:7-11 (Underdown & Brawley).

-4-

26.     The bus in which Moya-Matute was traveling on April 5, 2007 made a stop in Albuquerque, New Mexico at approximately 7:00 a.m.  See Tr. at 61:22-62:1 (Johnson & Moya-Matute).

27.     Moya-Matute was traveling on a Greyhound bus from Indianapolis.  See Tr. at 61:17-21 (Johnson & Moya-Matute).

28.     There were about thirty-five people on the bus on which Moya-Matute arrived.  See Tr. at 62:2-4 (Johnson & Moya-Matute).

29.     At approximately 7:00 a.m., Moya-Matute exited the bus and proceeded to the restroom inside the bus terminal.  See Tr. at 62:9-11 (Johnson & Moya-Matute).

30.     Moya-Matute then got in line to see if he could buy food.  See Tr. at 62:13-14 (Moya-Matute).

31.     Moya-Matute had met a person on the bus, and wanted to see if he could share some food with him.  See Tr. at 62:14-17 (Moya-Matute & Johnson).

32.     On the morning of April 5, 2007, Knoll and Underdown encountered Moya-Matute at the bus station by the snack bar area.  See Tr. at 23:16-20 (Brawley & Underdown).[2]

---

[2]  In Moya-Matute's motion to suppress, he originally stated:

> At approximately 7:00 a.m., Mr. Moya exited the bus and proceeded to the Greyhound Station's snack area. Mr. Moya was buying food at the station's snack stand when he was approached by Border Patrol Agents Mike Underdown and Brian Knoll. One of the agents approached from one side and the other from the other side. Once they had corralled him, one of the agents asked Mr. Moya if he had "papers." Mr. Moya initially told the agents that he did and that they were in his bag on the bus. The agents then grabbed him by the arm and belt-loop and escorted him outside of the station.

Defendant's Motion to Suppress and Memorandum in Support Thereof, filed July 4, 2007 (Doc. 16)(emphasis added).  At the hearing, however, Moya-Matute testified that he was walking out of the snack bar area when he saw two agents coming towards him from the front of the terminal.

33.     There were over thirty-five people in the bus terminal.  See Tr. at 65:9-13 (Johnson & Moya-Matute); Tr. at 35:7-8 (Johnson & Underdown)(Underdown could not recall how many people were in the bus station on April 5, 2007 when they encountered Moya-Matute).[3]

34.     There were about fifteen people in the snack bar area.  See Tr. at 65:14-16 (Johnson & Moya-Matute).[4]

35.     Knoll and Underdown encountered Moya-Matute by the snack bar line.  See Tr. at 25:2-5 (Brawley & Underdown).

36.     Underdown stood behind Knoll.  See Tr. at 25:12-13 (Brawley & Underdown).

37.     Knoll talked to Moya-Matute.  See Tr. at 25:14-15 (Brawley & Underdown).

---

See Tr. at 64:1-18 (Johnson & Moya-Matute).  Moya-Matute testified that the agents encountered him near a trash can while his back was facing a wall.  See Tr. at 64:22-25 (Moya-Matute & Johnson).  Moya-Matute testified that he could not get away from the agents, because they were blocking his exit so he could not go anywhere.  See Tr. at 67:5-7 (Johnson & Moya-Matute).  Moya-Matute testified he did not feel like he could just walk away from them when he was approached by Underdown and Knoll because they were blocking his exit.  See Tr. at 68:18-25 (Johnson & Moya-Matute).  Moya-Matute's counsel, Ms. Erlinda Johnson, explained the discrepancy between her brief and her client's testimony at the evidentiary hearing: "In further conversation actually when I went to speak with my client to interview him in preparation for the motion and for this particular case, which I don't know if this now puts me in the realm of a witness of a potential witness or I can submit to the Court a proffer essentially my client clarified exactly where he was encountered.  My initial interpretation was incorrect, and what I told the investigator was incorrect." Tr. at 93:21-94:3 (Johnson).  Because of this inconsistency in Moya-Matute's account of the location of the encounter and because Underdown was so adamant about the location but not on other facts, the Court finds Underdown's account of the physical location of the encounter more credible than Moya-Matute's.

[3]  The Court will not make any finding regarding how many people, if anyone, Underdown and Knoll encountered other than Moya-Matute.  There is insufficient evidence in the record to make such a finding.  See Tr. at 42:24-43:3 (Johnson & Underdown).

[4]  Underdown testified that Moya-Matute may have been the only person in the snack bar area.  See Tr. at 41:11-14 (Johnson & Underdown).  Underdown could not recall, however, how many people were in the bus terminal on April 5, 2007, or how many people he and Knoll encountered.   See Tr. at 35:7-8 (Johnson & Underdown).  Accordingly, on the number of people in the snack bar area, the Court credits Moya-Matute's testimony more than Underdown's vaguer recollections.

38.     Underdown was standing at an angle, so they were not standing in a straight line against the counter.  See Tr. at 25:16-19 (Brawley & Underdown).

39.     Knoll was approximately three feet from Moya-Matute.  See Tr. at 25:21 (Underdown).

40.     Underdown was approximately six feet away from Moya-Matute.  See Tr. at 26:14-17 (Brawley & Underdown).

41.     Underdown and Knoll approached Moya-Matute because he was in the bus station, and they were trying to encounter as many people as they could.  See Tr. at 27:3-4 (Underdown).

42.     Knoll initially spoke English to Moya-Matute, but then spoke to Moya-Matute in Spanish.  See Tr. at 27:8-9 (Underdown).[5]

43.     Knoll used a normal tone when he spoke with Moya-Matute.  See Tr. at 69:1-3 (Johnson & Moya-Matute).

44.     Underdown never spoke with Moya-Matute at all.  See Tr. at 67:23-24 (Johnson & Moya-Matute).

45.     Underdown could not hear everything that Knoll was telling Moya-Matute.  See Tr. at 44:17-19 (Johnson & Underdown).

46.     Underdown could not understand or did not know exactly what Knoll and Moya-

----

[5]  Moya-Matute testified that Knoll spoke to him in Spanish first.  See Tr. at 67:11-13 (Johnson & Moya-Matute).  The Court finds Underdown's testimony is more credible that Knoll spoke to Moya-Matute in English first and greeted Moya-Matute, because when Underdown and Knoll encountered people, either on a bus or in the bus terminal, they had a standard practice of always greeting the people in English.  See Tr. at 22:7-11 (Underdown & Brawley). Moreover, the most likely scenario is that, because Moya-Matute did not understand English, the first thing he apparently understood Knoll say was in Spanish.  Nevertheless, the Court believes Underdown that Knoll's first words were in English, which Underdown would have understood.

Matute were saying.  See Tr. at 45:7-10 (Johnson & Underdown).[6]

47.     Underdown could not recall what exactly was said during the initial encounter between Knoll and Moya-Matute.  See Tr. at 53:1-4 (Underdown).

48.     Underdown did not understand enough Spanish at the time that Knoll began to talk to Moya-Matute to determine whether Knoll asked Moya-Matute to see his papers.  See Tr. at 94:20-25 (Court & Underdown).

49.     Underdown could not understand Knoll's first couple of questions in Spanish to Moya-Matute.  See Tr. at 53:11-12 (Underdown).

50.     Because Knoll and Moya-Matute were speaking in Spanish, that "took [Underdown] a little out of the picture, but [he could] still understand general stuff in Spanish."  Tr. at 27:10-11 (Underdown).  Underdown stated: "The words I pick up are immigration papers or places they're from, stuff like that."  Tr. at 53:11-12 (Underdown).  Moya-Matute asserted that he was from Honduras, that he did not have his papers on him, and that his papers were in his bag outside.  See Tr. at 27:24-28:1-2 (Underdown).

51.     Knoll came up to Moya-Matute, identified himself as an immigration agent, and asked to see Moya-Matute's papers to be in the country legally.  See Tr. at 66:1-6 (Moya-Matute & Johnson).

52.     The first thing that Moya-Matute said was that he was "from Honduras."  Tr. at

---

[6] Underdown also testified. however, that, if he had not have understood what was going on, he would have said "Brian, what's going on." Tr. at 45:15-17 (Underdown). He did not, however, indicate that he made such an inquiry. Accordingly, the Court concludes that Underdown had an overall understanding of what was said, and some specific statements, but not Knoll's first statements to Moya-Matute.

53:16-20 (Court & Underdown).[7]  The Court finds that Underdown's testimony regarding his ability to comprehend and speak Spanish was credible.[8]

53.     Underdown could not identify at what point in the conversation between Knoll and Moya-Matute that Moya-Matute told Knoll he was from Honduras, because Underdown either could not hear them or could not understand them.  See Tr. at 96:15-25 (Johnson & Underdown).

54.     Moya-Matute told Knoll his immigration papers were on the bus because he was embarrassed by everyone looking at him.  See Tr. at 68:2-5 (Johnson & Moya-Matute).

55.     Underdown believed that, under 8 U.S.C. § 1304(e), Moya-Matute had to have his papers on him.  See Tr. at 28:3-5 (Brawley & Underdown).

56.     Knoll and Underwood began laughing once Moya-Matute told them he did not have the papers at all.  See Tr. at 69:4-6 (Johnson & Moya-Matute).

57.     Underdown testified that, once Moya-Matute did not have his papers on his person, he could have lawfully arrested him.  See Tr. at 28:12-15 (Brawley & Underdown), id. at 28:23-29:4

---

[7]  Moya-Matute testified that he never told Knoll nor Underdown that he was from Honduras. See Tr. at 79:2-3 (Johnson & Moya-Matute).  Moya-Matute testified that, once Knoll and Underdown took him to the immigration office, they asked him for identification, he gave them his license, and then they realized he was from Honduras.  See Tr. at 79:4-7 (Moya-Matute). Underdown's testimony is more credible than Moya-Matute's about when Knoll and Underdown realized Moya-Matute was from Honduras.  Although Underdown may not be fluent in or understand Spanish, he testified that he understood Moya-Matute told Knoll he was from Honduras, and the Court finds that testimony credible.  Neither side's story makes much sense if the agents did not know where Moya-Matute was from until after they left the bus station.

[8]  While Underdown's Spanish was not as good as Knoll's or Moya-Matute's, Underdown tended to understate his fluency in Spanish rather than exaggerate it.  At one point during the hearing, Moya-Matute's counsel asked Underdown: "How do you say in Spanish, [']May I see your immigration documents to be legal in the United States?[']" Tr. at 95:23-24 (Johnson).  Underdown answered in Spanish: "Papeles de inmigracion."  Id. at 95:25 (Underdown).  This exchange on the stand and his frankness about his limitations, lent credibility to Underdown's testimony about what occurred in the first moments of the encounter.

(Underdown).

58.     Once Moya-Matute told Knoll that his immigration papers were on the bus, Knoll grabbed him by his belt loop and took him outside, while Underdown walked next to him.  See Tr. at 68:13-15 (Johnson & Moya-Matute); Tr. at 29:8-9 (Underdown).

59.     Underdown and Knoll then escorted Moya-Matute out of the bus station to get his papers.  See Tr. at 28:10-11 (Underdown).

60.     Underdown walked about six feet in front of Knoll and Moya-Matute.  See Tr. at 29:10-12 (Underdown).

61.     Within five feet of exiting the front doors, Moya-Matute told Knoll he did not have any immigration papers.  See Tr. at 29:23-30:10 (Brawley & Underdown); id. at 68:16-17 (Johnson & Moya-Matute).

62.     Moya-Matute did not tell Knoll he did not have papers in response to further questioning.  See Tr. at 30:11-12 (Brawley & Underdown).

63.     The entire encounter between Moya-Matute and Knoll lasted about a minute or two. See Tr. at 30:13-16 (Brawley & Underdown).

64.     Had Moya-Matute had his papers in his bag outside, Knoll and Underdown would have let him go, because "it's a minor thing."  Tr. at 30:23-25 (Underdown).

65.     Moya-Matute was taken to the Border Patrol office by car.  See Tr. at 31:19-20 (Brawley & Underdown).

66.     Moya-Matute rode with Knoll.  See Tr. at 31:20-21 (Underdown).

67.     Moya-Matute was taken to the Border Patrol office for processing.  See Tr. at 31:22-23 (Brawley & Underdown).

68.     Once they were at the Border Patrol office, Knoll started getting Moya-Matute's

biographical information and getting the fingerprint machine ready.  See Tr. at 32:1-6 (Brawley & Underdown).

69.     "Border Patrol has a radio out at I'm not sure where they're out of, but they fax name and date of birth over to them, and it comes back. . . . [T]hey do record  checks with CIS, NCIC several different criminal and  immigration databases to see if the person has been encountered by a Border Patrol or if he has prior criminal history in the United States."  Tr. at 32:11-17 (Underdown).

70.     Moya-Matute's name and fingerprints were run through criminal and immigration databases to see if he had been encountered by a Border Patrol, or if he had a prior criminal history in the United States.  See Tr. at 32:10-21 (Brawley & Underdown).

71.     This procedure is typically what is done in the course of Underdown's duties when he makes an arrest.  See Tr. at 32:7-9 (Brawley & Underdown).

72.     If Moya-Matute had refused to be fingerprinted, the immigration and criminal databases checked would have given the agents Moya-Matute's name and date of birth.  See Tr. at 32:22-33:3 (Brawley & Underdown).

73.     The Court finds that Moya-Matute's fingerprints were obtained for and motivated by an administrative purpose.

74.     The report submitted by Knoll does not delineate the agents' reasonable suspicion for seizing Moya-Matute.  See Tr. at 35:19-21 (Johnson & Underwood).

75.     Underwood did not write a report.  See Tr. at 35:17-18 (Johnson & Underwood).

76.     At the time of the hearing, Knoll had a serious medical condition and was not able able to testify. See Tr. at 13:1-4 (Underdown).

## PROCEDURAL BACKGROUND

On June 13, 2007, a grand jury returned an indictment against Moya-Matute, charging him with one count of re-entry of a removed alien, in violation of 8 U.S.C. § 1326(a) and (b).  See Redacted Indictment, filed June 13, 2007 (Doc. 11).  Moya-Matute was arraigned on the Indictment on June 21, 2007.  See Clerk's Minutes, filed June 21, 2007 (Doc. 14).

On  July 4, 2007, Moya-Matute filed a motion to suppress.  See Defendant's Motion to Suppress and Memorandum in Support Thereof ("Motion"), filed July 4, 2007 (Doc. 16). The Honorable John E. Conway, Senior United States District Judge, set a hearing on the matter for August 30, 2007.  See Notice of Hearing, filed Aug. 2, 2007 (Doc. 20).  The hearing was vacated, however, when Judge Conway recused himself from the case.  See Clerk's Minutes, filed Aug. 30, 2007 (Doc. 27); Minute Order, filed Sept. 6, 2007 (Doc. 28).  The case was then assigned to Judge Browning.  See Minute Order, filed Sept. 6, 2007 (Doc. 28).

Moya-Matute moves the Court for an order suppressing the evidence of his identity, fingerprints, statements, and immigration file, and all observations of his presence in the United States, obtained as a result of alleged constitutional violations occurring on April 5, 2007.  See Motion at 9.  Moya-Matute contends that the arresting Border Patrol agents violated his constitutional rights.  See Motion at 9.  Moya-Matute contends that the agents violated his Fourth and Fifth Amendment rights under the United States Constitution.  See id.

Moya-Matute contends that the agents detained him while he stood in line at the snack stand, without reasonable suspicion that he was violating any immigration laws.  See  Motion at 4.  Moya-Matute further argues that "he was under a de facto arrest blatantly lacking in probable cause."  Id. Moya-Matute also contends that border patrol agents' authority to patrol is limited if more than 100 miles from the border.  See id.  Moya-Matute  contends that Fourth Amendment scrutiny is

heightened because the incident occurred more than 100 miles from the border.  See Motion at 5.

Moya-Matute contends that the Court must suppress evidence of his identity because it resulted from his illegal seizure.  See id.  Moya-Matute contends that the United States cannot show that the evidence of his identity is free from taint of the agents' illegal seizure of him, because the factors set forth in Brown v. Illinois, 422 U.S. 590 (1975), militate in his favor.  See Motion at 6-7. Moya-Matute argues that evidence of identity is not exempt from the exclusionary rule.  See id. at 7.   Moya-Matute also contends that jurisdictional challenges and evidentiary challenges to fingerprint evidence are distinct, and that the Supreme Court of the United States' language in I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1047 (1984), does not preclude the application of exclusionary-rule analysis to determine admissibility of fingerprint evidence.  See Motion at 8.

The United States filed a response to Moya-Matute's suppression motion on August 2, 2007. See Response to Defendant's Motion to Suppress and Memorandum in Support Thereof ("Response"), filed Aug. 2, 2007 (Doc. 19).  The United States contends that Underdown's inability to recall exactly what Moya-Matute said at the bus terminal is "understandable," because "Knoll and Underdown encounter thousands of illegal aliens each year."  Response at 4 n.2.  The United States contends that the initial encounter between the agents and Moya-Matute was consensual. See Response at 5.

The United States interprets Moya-Matute's motion to raise a claim of selective enforcement. See Response at 7.  The United States contends that, to prove selective enforcement, Moya-Matute would have to prove that a similarly-situated person of another race could have been, but was not, stopped or arrested for the offense that Moya-Matute was stopped or arrested for.  See Response at 7.  The United States argues Moya-Matute must show that Knolls and Underdown were motivated by a discriminatory purpose and that their actions had a discriminatory effect.  See Response at 7

(citing <u>United States v. Alcaraz-Arellano</u>, 441 F.3d 1252, 1264 (10th Cir. 2006)).  The United States contends that Moya-Matute cannot prove a claim of selective law enforcement.  <u>See</u> Response at 7.

The United States further contends, that even assuming for the purpose of argument that the agents detained Moya-Matute, the agents had a reasonable suspicion that Moya-Matute was violating immigration laws, so an investigative detention of him was authorized.  <u>See</u> Response at 8-11.  The United States contends that Knoll and Underdown had particularized and objective facts, based on their training and experience, that the bus station was a staging area for undocumented aliens.  <u>See</u> Response at 9.  The United States argues that the agents knew Moya-Matute was not a United States citizen, because Moya-Matute either told them he was from Honduras, or could not answer the agents' "simple questions, when asked in Spanish, about where he was from, where he was born, and where he went to school."  Response at 9.  The United States contends that, once the agents realized Moya-Matute was not a United States' citizen, "he was legally required to have a certificate of alien registration or an alien registration receipt card on his person, to show he was legally in the United States."  Response at 10 (citing 8 U.S.C. § 1304(e)).

The United States argues that, once Moya-Matute told them he had no immigration papers on his person, "[t]he agents had probable cause to believe [Moya-Matute] violated 8 U.S.C. § 1304(e), and thus they escorted him to the bus so he could retrieve the papers he claimed to have."  Response at 10.  The United States argues that "[t]he agents did not formally arrest [Moya-Matute] or place him in handcuffs, but rather briefly detained him while giving him time to show that he was in compliance with the law."  <u>Id.</u>  The United States contends it was reasonable for the agents to detain Moya-Matute once they knew he had no papers on his person. <u>Id.</u> (citing <u>Martinez v. Nygaard</u>, 831 F.2d 822, 827-28 (9th Cir. 1987)).  The United States argues "[Moya-Matute]'s

admission of being in violation of 8 U.S.C. § 1304(e) was sufficient probable cause for the detention while he was escorted to the bus.  The brief investigatory stop was justified, and therefore [Moya-Matute]'s constitutional rights were not violated and the exclusionary rule does not apply." Response at 11.

The United States further contends that the agents had probable cause to arrest Moya-Matute. See Response at 11-12.  The United States argues that once Moya-Matute "told the agents he did not have any immigration papers showing he was authorized to be in the United States, and the agents knew he was not a United States citizen because he either said he was from Honduras or else could not answer their questions about his origins" the agents had probable cause to believe that Moya-Matute was in violation of 8 U.S.C. § 1304(e).  Response at 12.  The United States also argues Moya-Matute "was clearly a flight risk." Id.  The United States asserts that "[i]t is doubtless that, had the agents left [Moya-Matute] at the bus station to obtain an arrest warrant, [Moya-Matute] would have been gone by the time the agents returned." Id.  Lastly, the United States concludes that "[t]he arrest of [Moya-Matute] on April 5, 2007 was proper, and the exclusionary rule should not apply."  Id.

The Court held an evidentiary suppression hearing on October 29, 2007.  At the hearing, the United States called one witness: Bureau of Immigration and Customs Enforcement Agent Mike Underdown, from Albuquerque.  The United States also introduced into evidence photographs of the Greyhound Bus Station in Albuquerque.  See Clerk's Minutes at 1, filed Oct. 30, 2007 (Doc. 37). Moya-Matute testified and also called as a witness, Albert Mares, a private investigator.  See id. at 2.  Moya-Matute first conceded that, if the encounter between him and the agents was consensual, then the agents could ask any question of him.  See Tr. at 99:15-22 (Court & Johnson).  Moya-Matute conceded that, if the encounter was consensual, then the agents could have directly asked

-15-

him about his papers without any "small talk" at all.  Id.  Moya-Matute conceded that, if the encounter was consensual, then it would be irrelevant whether Underdown understood what was said between Moya-Matute and Knoll.  See id. at 102:21-25 (Court & Johnson).

Later in the hearing, however, Moya-Matute asserted that what Agent Knoll said in Spanish is relevant for the Court's determination whether the encounter was consensual.  See Tr. at 103:7-13 (Court & Johnson).  Moya-Matute contended that, because the encounter was not consensual, the officers must have had a reasonable suspicion to believe he was violating immigration laws to ask him about papers.  See Tr. at 108:4-25 (Court & Johnson).  Moya-Matute further contended that the officers could not walk through the bus station asking everybody: "Do you have your papers?" because they would have to have some circumstantial evidence to ask that question.  Tr. at 110:3-10 (Court & Johnson).  Moya-Matute contended that there must be an "understanding that [the approached person] [does not] have to answer [the officers'] questions."  Tr. at 111:19-21 (Johnson). Moya-Matute contended that, once he said he did not have papers, that did not establish probable cause, because

> he could have been a naturalized citizen [and] as a naturalized citizen he's not required to carry documentation of his status in the United States.  He could have been a naturalized citizen who didn't speak English.  So there needed to be more, so without more you do need additional information.  He could not have been placed under arrest.

Tr. at 116:18-25 (Johnson).  Moya-Matute maintained that even his statement that he was from Honduras and did not have papers would be insufficient information for probable cause to arrest him.  See Tr. at 117:1-4 (Court & Johnson).  Moya-Matute's counsel gave the example that she is from Nicaragua, but  is not required to carry her immigration documents with her, because she is a naturalized citizen.  See Tr. at 117:4-8 (Johnson).  Moya-Matute contended that, when an officer asks a person "Where are your papers to be legally here in the United States?" he or she must have

-16-

a reasonable suspicion to ask that question.  See Tr. at 133:14-17 (Johnson).

        The United States explained that a "staging area" is an area that undocumented persons frequent.  See Tr. at 119:19-120:7 (Court & Brawley).  The United States acknowledged that Underdown could not testify "specifically sentence by sentence what Agent Knoll said to [Moya-Matute] but [Underdown] did say that Mr. Moya-Matute said ["]I'm from Honduras and I've got immigration papers either on the bus or on a bag on the bus [--] Agent Underdown didn't recall which." Tr. at 122:17-22 (Brawley).  The United States conceded that the Court's determination of whether the encounter was consensual depends on what was said during the encounter, how the officers and Moya-Matute were positioned, and their body language.  See Tr. at 123:15-22 (Brawley).  The United States noted that "nobody ever told Mr. Moya-Matute you're not going anywhere you must stand here."  Tr. at 123:20-22 (Brawley).  The United States noted that "Mr. Moya-Matute himself did not testify that the agents made any coercive[-]type statements to him, making him feel like base[d] on their language he had to stay there."  Tr. at 124:1-4 (Brawley).  The United States contended that it was "obvious" to the officers that Moya-Matute was not a naturalized citizen, because "[h]e lied and said those papers are on the bus.  He didn't say anything like: ['W]hat papers[? W]hy do I need papers[?']"  Tr. at 126:7-9 (Brawley).  The United States conceded that, once the officers grabbed Moya-Matute by his belt-loop or by his arm, they needed probable cause to do so.  See Tr. at 126:17-21 (Court & Brawley).  The United States agreed that a discussion of reasonable suspicion is irrelevant to the suppression motion.  See Tr. at 127:21-4 (Court & Brawley). The United States contended that the officers had probable cause to arrest Moya-Matute as violating 8 U.S.C. §1304(c).  See Tr. at 127:14-20.

        On November 30, 2007, Moya-Matute's counsel, Ms. Erlinda Johnson, sent a letter to the Court.  See Letter from Erlinda Johnson to the Court (dated November 30, 2007, filed December

7, 2007 (Doc. 43))("November 30, 2007 letter").  Attached to that letter was a copy of United States v. Oscar-Torres, 507 F.3d 224 (4th Cir. 2007).  See November 30, 2007 letter at 3-10. Moya-Matute contended that United States v. Oscar-Torres is applicable to his case.  See id. at 1.  Moya-Matute contended that the court in  United States v. Oscar-Torres relied upon United States v. Brignoni-Ponce, 422 U.S. 873 (1975), "for the proposition that in order for a person to be questioned about alienage, the law enforcement officer must have reasonable suspicion to believe the person is violating a law or regulation."  November 30, 2007 letter at 1 (citing United States v. Oscar-Torres). Moya-Matute requests that the Court consider United States v. Oscar-Torres in deciding his suppression motion.  See November 30, 2007 letter at 1.

On December 6, 2007, Kimberly A. Brawley, Assistant United States Attorney, wrote a letter to the Court in response to Moya-Matute's November 30, 2007 letter.  See Letter from Kimberly A. Brawley to the Court (dated December 6, 2007), filed December 7, 2007 (Doc. 42)("December 6, 2007 letter").  The United States reviewed the facts of  the case appealed in United States v. Oscar-Torres.  See December 6, 2007 letter (referencing United States v. Oscar-Torres, No. 05-CR-224-1H (3)(E.D.N.C. January 20, 2006)(Daniel, M.J.)).  The United States also referenced the district court's Order finding that the arrest of the defendant was unlawful.  See December 6, 2007 letter, Order, No. 05-CR-224-1H(3)(E.D.N.C. March 13, 2006)(Howard, J.).  The United States contended that the United States Court of Appeals for the Fourth Circuit adopted the United States Court of Appeals for the Tenth Circuit's rule from United States v. Olivares-Rangel, 458 F.3d 1104 (10th Cir. 2006). See December 6, 2007 letter at 1.  The United States argued: "Because the Fourth Circuit adopted the Tenth Circuit's prior ruling in U.S. v. Olivares-Rangel, the case of U.S. v. Oscar-Torres does not advance any new arguments or theories for Mr. Moya.-Matute."  December 6, 2007 letter at 2.  The United States also disagreed with Moya-Matute's assertion that the  United States v. Oscar-Torres

-18-

court relied upon <u>United States v. Brigoni-Ponce</u> for the assertion that an officer must have a reasonable suspicion to believe a person is violating a law or regulation to question him or her about alienage. <u>See</u> December 6, 2007 letter at 2. The United States maintained that <u>United States v. Brignoni-Ponce</u> is inapplicable to Moya-Matute's case, because it "involved a consensual encounter inside a bus station in Albuquerque, New Mexico." <u>Id.</u>

<b><u>RELEVANT FOURTH AMENDMENT LAW</u></b>

The Fourth Amendment guarantees that people will be secure against unreasonable search and seizures. Accordingly, the Fourth Amendment protects against unreasonable seizures. <u>See</u> U.S. Const. amend. IV. "The touchstone of an analysis of a seizure under the Fourth Amendment is reasonableness." <u>United States v. Baity</u>, No. CR 05-186 JB, 2006 WL 1305036, at *4 (D.N.M. Jan. 25, 2006)(Browning, J.)(citing <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 108-109 (1977)).

"Evidence seized pursuant to a warrantless search, once questioned,  must be suppressed unless the search and seizure come within an exception to the Fourth Amendment requirement of a warrant. The burden is on those seeking the exemption to show the need for it." <u>United States v. Baity</u>, 2006 WL 1305036, at *4 (internal quotations omitted).

"In analyzing Fourth Amendment search and seizure issues, the Tenth Circuit has separated police and citizen interactions into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests." <u>United States v. Grant</u>, No. CR 05-2511, 2006 WL 1305037, at * 5 (D.N.M. Apr. 10, 2006)(Browning, J.)(citing <u>Oliver v. Woods</u>, 209 F.3d 1179, 1186 (10th Cir. 2000)).

> In determining whether a seizure comports with the Fourth Amendment, courts have identified three categories of police encounters: "[i] consensual encounters which do not implicate the Fourth Amendment . . . [ii] investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity . . . and [iii] arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

-19-

United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996)(quoting United States v. Davis, 94

F.3d 1465, 1467-68 (10th Cir. 1996)).  Further,

> [t]hese categories are not static.  A consensual encounter may escalate into an
> investigative detention.  An investigative detention may escalate into a full-blown
> arrest or it may de-escalate into a consensual encounter.  A reviewing court must
> analyze each stage of the encounter, ensuring that the requisite level of suspicion or
> cause is present at each stage.

United States v. Shareef, 100 F.3d at 1500.  "Much as a bright line rule would be desirable, in

evaluating whether an investigative detention is unreasonable, common sense and ordinary human

experience must govern over rigid criteria." United States v. Espinosa, 782 F.2d 888, 891 (10th Cir.

1986)(internal quotations omitted).

### A.    CONSENSUAL ENCOUNTERS.

Not all encounters between police officers and private citizens require a suspicion of wrong-

doing.  See Florida v. Bostick, 501 U.S. 429, 434 (1991); United States v. Little, 18 F.3d 1499, 1504

(10th Cir. 1994).   A police-citizen encounter may be the voluntary cooperation of a citizen in

response to non-coercive questioning.  See Florida v. Bostick, 501 U.S. at  438.  This encounter

raises no constitutional issues, because this contact is not a seizure within the meaning of the Fourth

Amendment.  See id.

In determining the willingness of a citizen to speak with law enforcement officers,  the court

applies an objective reasonableness test:   "[W]hat would the typical reasonable person have

understood by the exchange between the officer and the suspect?"  United States v. Kimoana, 383

F.3d 1218, 1229 (10th Cir. 2004)(internal quotations omitted).  The scope of an individual's consent

is based on the totality of the circumstances.  See United States v. Manjarrez, 348 F.3d 881, 883

(10th Cir. 2003).  A police officer does not have to inform the person approached that he or she may

refuse to answer questions for the encounter to be consensual.  See United States v. Little, 18 F.3d

1505 (noting that there is "no per se rule" requiring that officers inform the encountered individual that she or he may refuse to answer questions).

The Supreme Court of the United States has held that officers seize a person when they detain him "for the purpose of requiring him to identify himself." Brown v. Texas, 443 U.S. 49, 50 (1979). "'[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.'" Id. (quoting Terry v. Ohio, 392 U.S. at 16). "Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Brown v. Texas, 443 U.S. at 50-51. "A central concern in balancing these competing considerations . . . has been to assure that an individual's reasonable expectation of privacy is not subject to the arbitrary invasions solely at the unfettered discretion of officers in the field." Id. at 51.

During the consensual encounter, the individual reasonably must believe that he or she is free to walk away. "'[O]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." United States v. Mendenhall, 446 U.S. 544, 552 (1980)(quoting Terry v. Ohio, 392 U.S. at 19). "As long as the person to whom questions are put remains free to disregard the questions and walk away there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." United States v. Mendenhall, 446 U.S. at 554.

The Supreme Court of the United States has provided the following "[e]xamples of circumstances that might indicate a seizure . . . [T]hreatening presence of several officers, the

display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

United States v. Mendenhall, 446 U.S. at 554. In United States v. Mendenhall, there was no seizure:

> The events took place in the public concourse.  The agents wore no uniforms and displayed no weapons.  They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents.  They requested, but did not demand to see the respondent's identification and ticket.  Such conduct without more, did not amount to an intrusion upon any constitutionally protected interest.  The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions.

Id. at 555.  The Supreme Court also clarified Brown v. Texas, explaining that, when the two officers approached Brown in the alley, asked him to identify himself and his reason for being there, and Brown refused to do so, there was no seizure.  See United States v. Mendenhall, 446 U.S. at 556. The Supreme Court characterized the Brown v. Texas decision as "simply [holding] . . . that because the officers had no reason to suspect Brown of wrongdoing, there was no basis for detaining him . . . ." Id.

An officer's display of badge does not make an encounter into a seizure.  See United States v. Drayton, 536 U.S. 194, 204 (2002).  Likewise, that an officer wears a sidearm does not make an encounter a seizure, because "[t]hat most law enforcement officers are armed is a fact well known to the public.  The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  On the other hand, "[i]t is undoubtedly true that a consensual encounter between a citizen and police can be transformed into a seizure through persistent and accusatory questioning by police."  United States v. Williams, 356 F.3d 1268, 1274 (10th Cir. 2004).  See United States v. Williams, 356 F.3d at 1274 (holding that the defendant was not seized because: (i) "[t]he encounter occurred

in a relatively open space . . . [and the defendant's] path of egress from the officers was at no time impeded[;] [ii] [n]one of the officers were uniformed nor did they at any time display a weapon"; and (iii) a reasonable person in the defendant's position would have felt free to terminate the encounter with the police).

In Florida v. Bostick, 501 U.S. 428 (1991), the Supreme Court noted: "Drug interdiction efforts have led to the use of police surveillance at airports, train stations, and bus depots.  Law enforcement officers stationed at such locations routinely approach individuals, either randomly or because they suspect in some vague way that the individuals may be engaged in criminal activity, and ask them potentially incriminating questions."  501 U.S. at 431.  The officers in Florida v. Bostick boarded the defendant's bus to ask him questions and to seek permission to search his luggage.  See id.  The officers asked the defendant if they could inspect his ticket and identification. See id.  They also explained their presence as narcotics agents on the lookout for illegal drugs.  See id.  They requested the defendant's consent to search his luggage.  See id.  "There is no doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure."  Id. at 434.  "[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage -- so long as the officers do not convey a message that compliance with their requests is required."  Id. at 437.

"While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.  I.N.S. v. Delgado, 466 U.S. 210, 216 (1984).  The Tenth Circuit has explained:

> A consensual encounter is the voluntary cooperation of a private citizen in response
> to non-coercive questioning by a law enforcement officer.  If the individual is free
> to leave at any time during the encounter he or she is not seized under the Fourth

Amendment.  Whether an encounter is a detention or a consensual encounter depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.  A person is seized only when that person has an objective reason to believe that he or she is not free to end the conversation with the officer and proceed on his or her way.

United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996)(internal citations omitted).  The

Tenth Circuit has identified several factors that are relevant in determining whether a person has

been seized within the meaning of the Fourth Amendment.  They include:

[i]  The threatening presence of several officers; [ii] the brandishing of a weapon by an officer; [iii] some physical touching by an officer; [iv] the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; [v] prolonged retention of a person's personal effects; [vi] a request to accompany the officer to the station; [vii] interaction in a nonpublic place or a small, enclosed space; [viii] and absence of other members of the public.

Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005)(internal quotations omitted).  The Tenth Circuit

has "refused to treat any of the factors cited above as dispositive."  Id.  "Nor are these factors

exclusive."  Id.  Instead, the Court, "[w]hen viewing the totality of the circumstances, it may be that

the strong presence of two or three factors demonstrates that a reasonable person would have

believed that he was not free to terminate an encounter with government officials.."  Id.  "Asking

questions which may elicit incriminating answers is irrelevant to a determination of whether an

encounter was consensual, although the manner in which the questions are asked is relevant;

accusatory, persistent, and intrusive questioning may turn an otherwise voluntary encounter into a

coercive one if it conveys the message that compliance is required."  Id. at 1499 (internal quotations

omitted).

An officer may seize a person by using  physical force on him.  See United States v. Harris,

313 F.3d 1228, 1235 (10th Cir. 2002).  In United States v. Harris, the defendant ignored an officer

and continued walking both times that the officer requested the defendant's identification.  See 313

F.3d at 1235.  The officer then ordered the defendant to remove his hands from his pockets, and when the defendant failed to do so, the officer removed the defendant's "hands from his pockets, and escorted him to the front part of his police car."  Id. at 1234.  The Tenth Circuit noted that "[a] police officer's assertion of authority without submission by the individual does not constitute a seizure."  Id. (citing Bella v. Chamberlain, 24 F.3d 1251, 1255 (10th Cir. 1994)).  "Accordingly, Defendant was not seized for purposes of the Fourth Amendment until [the officer] implemented physical force by removing Defendant's hands from his pockets and escorting him to the police car."  United States v. Harris, 313 F.3d at 1235.

There is no Fourth Amendment prescription regarding the content of officers' questions during a consensual encounter, so long as the officers' questions are not coercive.  "Although accusatory, persistent, and intrusive questioning may turn an otherwise voluntary encounter  into a coercive one, this is true only if the officers convey the message that compliance is required."  United States v. Torres-Guevara, 147 F.3d 1261, 1265 (10th Cir. 1998)(internal quotations and citations omitted).  "'As long as the [deputy's] questioning did not extend the length of the detention, . . . there is no Fourth Amendment issue with respect to the content of the questions.'"  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006)(quoting United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005)).  "[T]he mere fact that officers ask  incriminating questions is not relevant to the totality-of-the-circumstances inquiry -- what matters instead is the manner in which such questions were posed."  United States v. Ringold, 335 F.3d 1168, 1174 (10th Cir. 2003)(internal quotations omitted).

## B.   INVESTIGATIVE DETENTIONS.

The Supreme Court set forth the rules regarding "investigative detentions" in Terry v. Ohio, 392 U.S. 1, 21 (1968).  A law enforcement officer may stop and briefly detain a person for

investigatory purposes if he has reasonable suspicion that criminal activity  "may be afoot," even when the level of suspicion does not amount to probable cause.  See Terry v. Ohio, 392 U.S. at 29. Under Terry v. Ohio, the validity of a detention depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Id. at 20.

Investigative detention with reasonable suspicion of illegal alienage is permissible so long as the detention does not last any longer than necessary to determine whether the individual is an alien illegally in the United States.   See United States v. Brignoni-Ponce, 422 U.S. at 881. Furthermore, the agent may not frisk any individual who has not been arrested unless the agent has a reasonable suspicion, based on specific articulable facts to "take such steps as are reasonably necessary to protect [his or her] personal safety and to maintain the status quo." United States v. Hishaw, 235 F.3d 565, 570 (10th Cir. 2000).

In determining whether an officer has reasonable suspicion, a court must consider "the totality of circumstances," i.e., the whole picture.  See United States v. Sokolow, 490 U.S. 1, 8 (1989).  Based on the whole picture, the detaining officer must have a particularized and objective basis for his suspicion that he can articulate.  See United States v. Cortz, 449 U.S. 411, 417-18 (1981).  The standard allows an officer to draw inferences and make deductions that might elude an untrained person.  See id. at 418.  An "inchoate and unparticularized suspicion or 'hunch,'" however, is insufficient.  United States v. Sokolow, 490 U.S. at 7 (quoting Terry v. Ohio, 392 U.S. at 27).

An officer must have reasonable suspicion to detain a person for investigation.  See Terry v. Ohio, 392 U.S. at 20. "'The government bears the burden of showing that an officer possessed objectively reasonable and articulable suspicion.'" United States v. Grant, No. CR 05-2511 JB, 2006

WL 1305037, at * 5 (D.N.M. Apr. 10, 2006)(Browning, J.)(quoting <u>United States v. Sieren</u>, 68 Fed.Appx. 902, 904 (10th Cir. 2003)).  "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002).

The Fourth Amendment demands that the detaining officer "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."  <u>Terry v. Ohio</u>, 392 U.S. at 21.  "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."  <u>Id.</u> at 27.    The Tenth Circuit determines the reasonableness of an investigative detention by applying a two-prong test: (i) whether the officer's action was justified at its inception; and (ii) whether it was reasonably related in scope to the circumstances which justified the interference in the first place.  <u>See</u> <u>United States v. Shareef</u>, 100 F.3d 1491, 1500 (10th Cir. 1996).

While the court must make the determination of reasonableness on a case-by-case basis, certain guidelines apply by which to measure an agent's actions.  The Immigration and Nationality Act (the "INA") allows an immigration agent to question a person, believed to be an alien, about his or her "right to be or to remain in the United States."  8 U.S.C. § 1357(a)(1).  An immigration law enforcement agent, "like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away."  8 C.F.R. § 287.8(b)(1).

An immigration law enforcement agent may briefly detain a person for questioning if the agent "has a reasonable suspicion, based on specific articulable facts, that the person being

-27-

questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States . . . "  8 C.F.R. §287.8(b)(2).  Agents are not precluded from approaching people and questioning them more than one-hundred miles from the border.  See 8. C.F.R. § 287.8(b)(1).

The Fourth Amendment, however, limits the above statutory provisions.  An immigration agent  may not question any individual as to his or her right to be or to remain in the United States unless the agent has a reasonable suspicion, based on specific and articulable facts involving more than ethic appearance, that the individual is an alien.  See United States v. Brignoni-Ponce, 422 U.S. 873, 886 (1975);[9] Illinois  Migrant Council v. Pilliod, 540 F.2d 1062, 1070 (7th Cir. 1976)(stating that, "[t]he district court held, and we agree, that a street stop is justifiable here only when the INS agent has a 'reasonable suspicion based on specific articulable facts that such a person is an alien [unlawfully]  in  the  [United  States].")(quoting  United  States  v.  Brignoni-Ponce,  422  U.S.  at 884)(alterations in original).

In Martinez v. Nygaard, 831 F.2d 822 (9th Cir. 1987), a team of INS agents executed a search warrant on a factory.  See id. at 824.  Once inside the factory, the INS agents "systematically questioned workers who appeared to be of Latin American ancestry, asking them for proof of legal residence." Id.  "The agents did not display their guns during the questioning or bar the exits." Id. "Badges and handcuffs were visible only when used to detain specific aliens not parties to [the] appeal." Id.  The United States Court of Appeals for the Ninth Circuit held that the immigration

---

[9]The Supreme Court in United States v. Brignoni-Ponce held that a violation of the Fourth Amendment occurs when a vehicle near the international border is stopped and the occupants are questioned about their immigration status and citizenship where the only ground for suspicion that the occupants of the vehicle are aliens is the occupants' apparent Mexican ancestry.  See 422 U.S. at 866.

officers reasonably detained a person for approximately twenty minutes, even where the officials threatened to tie her hands if she tried to leave, while they waited for her co-worker to obtain her immigration papers.  See id. at 827-28.  The Ninth Circuit further held that the immigration officers had probable cause to believe that another person involved in the factory sweep had violated the "green card statutes," 8 U.S.C. §1304(c), by not having her papers on her person, and thus the arrest of that person was reasonable when she admitted that she was an alien and failed to produce her green card.  Martinez v. Nygaard, 831 F.2d at 828.  The Ninth Circuit also held that a person was not seized within the meaning of the Fourth Amendment when an INS agent grabbed him by the shoulder to get him to answer questions, because the agent who grabbed him held him so briefly that any detention was not a seizure.  See id. at 826.  The Ninth Circuit noted that one of the plaintiffs testified he was not afraid of the agents, that after he showed his papers upon their request,  that plaintiff left, and that it did not appear that he was pressured into answering questions or restrained.  See id. at 827.  Another person was detained when an agent prevented her from leaving an area where the agents were detaining suspected aliens.  See id. at 827.  That same person was also detained when she attempted to leave the building to retrieve a co-worker's papers and an INS agent physically restrained her until another agent said she could go.  See id.  The Ninth Circuit held that the detention of that person was unreasonable, because "an INS officer must have an objectively reasonable suspicion that a particular worker is an illegal alien."  Id.

       The court must look at the totality of the circumstances to determine whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.  See United States v. Arvizu, 534 U.S. at 273.  "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct."  Id. at 277.  "Law enforcement officers may perceive meaning in actions that appear innocuous to the untrained observer."  United States v. Gutierrez-

Daniez, 131 F.3d 939, 942 (10th Cir. 1997). "This process allows officers to draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. at 273.

When assessing the reasonableness of the officer's actions, the court must "judge the officer's conduct in light of common sense and ordinary human experience." United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)(citations omitted). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Illinois v. Wardlow, 528 U.S. at 125. "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate defense to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Gutierrez-Daniez, 131 F.3d at 942.

It may be appropriate at times to look at officers' collective knowledge in determining whether they behaved reasonably. See United States v. Shareef, 100 F.3d at 1504. The presumption of communication is rebutted if information was not, in fact, shared. See id. Further, "[w]hen an officer is conducting a lawful investigative detention based on  reasonable suspicion of criminal activity, the officer may ask for identification and for an explanation of the suspect's presence in the area." Oliver v. Woods, 209 F.3d at 1189.

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). "But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id. See United States v. Gutierrez-Daniez, 131 F.3d at 942 ("[A]n

area's disposition towards criminal activity is an articulable fact that may be considered along with more particularized factors to support reasonable suspicion.")(internal quotations omitted).  See United States v. Fernandez, 388 F.3d 1256, 1265 (10th Cir. 2004), cert. denied, 544 U.S. 1043 (2005)("[M]ere propinquity to others independently suspected of criminal activity is insufficient, standing alone, to create an articulable suspicion. . . .").  On the other hand, "[g]eneral profiles that fit large numbers of innocent people do not establish reasonable suspicion."  United States v. Grant, 2006 WL 1305037, at * 6 (internal quotations omitted).

### C.    PROBABLE CAUSE.

"An arrest is "characterized by highly intrusive or lengthy search or detention," and must therefore be supported by probable cause. Probable cause to arrest exists only when the "facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004)(internal citations and quotations omitted).  "To determine if probable cause exists, a court looks to "whether at that moment the facts and circumstances within [the officer's]  knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [officer] in believing that the petitioner had committed or was committing an offense." United States v. Snow, 82 F.3d 935, 942 (10th Cir. 1996)(internal quotations omitted).  "[P]robable cause must exist at the moment of the arrest." United States v. Hansen,  652 F.2d 1374, 1388 (10th Cir. 1981).

Probable cause is "evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer." Id. (internal quotations omitted).  "Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent [officer] in believing that an offense has

been or is being committed. This is an objective standard; the subjective belief of an individual officer as to whether there is probable cause is not dispositive. " Boydston v. Isom, 224 Fed.Appx. 810, 814 (10th Cir. 2007)(internal citation and quotations omitted).  "Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion." United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998), cert. denied, 525 U.S. 978 (1998).

The quantum of evidence sufficient to satisfy probable cause is higher than that for reasonable suspicion.  As the Tenth Circuit stated in United States v. Valenzuela, 365 F.3d 892 (10th Cir. 2004): "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Id. at 896 (quoting Alabama v. White, 496 U.S. 325, 330 (1990))."That the facts may not support a conclusion that [the defendant] actually violated  the law is irrelevant; reasonable suspicion requires a showing considerably less than preponderance of the evidence, and may be justified on a quantum of evidence far less than that required to establish probable cause ." United States v. Vercher, 358 F.3d 1257, 1263 (10th Cir. 2004)(internal citation and quotations omitted).

"[T]he primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." United States v. Valenzuela, 365 F.3d at 896-97.  Probable cause may be based on the collective information of the officers involved in the arrest, "rather than exclusively on the extent of the knowledge of the particular officer who may actually make the arrest." Karr v. Smith, 774 F.2d 1029, 1031 (10th Cir. 1985).  In Karr v. Smith, the facts within the arresting officers' knowledge based upon a sergeant's knowledge were "sufficient to warrant a prudent man in believing that an

offense had been committed" because the evidence showed that the sergeant was present at the scene and saw damage to a truck; saw that tires had been slashed and the valves of the truck opened to allow hazardous materials to leak out; based on his observations, he determined the damage was intentional; and the truck owner told the sergeant he knew that Karr had done the damage and had threatened to vandalize the truck, and that he intended to pursue prosecution against Karr himself. See 774 F.2d at 1031-32. The arresting officers arrested Karr based upon the sergeant's orders. See id. at 1032. The arresting officers were deemed to have whatever knowledge the sergeant had. See id.

A court may not "arrive at probable cause by simply piling hunch upon hunch." Id. at 897. "To defer to an officer's interpretation of the facts without applying judgment informed by the Fourth Amendment would eviscerate the need for a judicial determination of probable cause." Id. at 902. "[A]ssociation with known or suspected criminals is not enough in itself to establish probable cause." United States v. Hansen, 652 F.2d at 1388. See United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996)(holding that officers had probable cause to arrest a defendant based upon cocaine discovered in the backpack of his cohort, his cohort's "beeline" to his car, the defendant's apparent haste to leave the parking lot upon sighting one of the police officers, and his nervousness in talking with an officer).

United States immigration law enforcement agents have statutory authority to arrest and detain aliens provided that they have probable cause to believe that the alien is illegally in the United States. Title 8 of the Code of Federal Regulations, Section 287.8(c)(2) provides:

> (i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States.
>
> (ii) A warrant of arrest shall be obtained except when the designated immigration

officer has reason to believe that the person is likely to escape before a warrant can
be obtained.

8 C.F.R. §287.8(c)(2)(i) and (ii).  Immigration law enforcement agents have additional powers to
search with a close proximity to the international border.  See 8 U.S.C. §1357(a)(3); 8 C.F.R.
§287.1(2).

### D.    THE EXCLUSIONARY RULE.

Evidence is not considered "fruit of the poisonous tree simply because it would not have
come to light but for the illegal actions of the police. Rather, the more apt question in such a case
is whether, granting establishment of the primary illegality, the evidence to which instant objection
is made has been come at by exploitation of that illegality or instead by means sufficiently
distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. at 487-88.
"To suppress evidence as the fruit of [an] unlawful detention, [the defendant] must make two
showings: [i] that the detention did violate his Fourth Amendment rights; and [ii] that there is a
factual nexus between the illegality and the challenged evidence."  United States v. DeLuca, 269
F.3d 1128, 1132 (10th Cir. 2001)(internal quotations omitted). Once the defendant has made those
showings, then the government must prove that the evidence the defendant seeks to suppress "is not
fruit of the poisonous tree, either by demonstrating that the evidence would have been inevitably
discovered, was discovered through independent means, or was so attenuated from the illegality as
to dissipate the taint of the unlawful conduct." Id. (internal quotations omitted).  A defendant must
at least show that "the evidence sought to be suppressed would not have come to light but for the
government's unconstitutional conduct." Id. (internal quotations omitted).

When law enforcement officers obtain evidence in violation of the Constitution, the
exclusionary rule generally precludes its use in a criminal prosecution against the victim of the

illegal seizure.  See Illinois v. Krull, 480 U.S. 340,  347 (1987)(citing Weeks v. United States, 232 U.S. 383 (1914)).  A defendant may secure the benefit of the exclusionary rule, however, only if his or her Fourth Amendment rights have been violated.  See United States v. Salvucci, 448 U.S. 83, 84-85 (1980).

The exclusionary remedy extends not only to the primary evidence obtained from the illegal seizure, but also to the indirect product of the seizure, the secondary evidence, or the "fruit of the poisonous tree." Nardone v. United States, 308 U.S. 338, 341(1913).  Once the defendant has shown a casual connection between the illegal seizure and the specific evidence alleged to be the fruit of the seizure, the government has the burden of persuasion of showing that the evidence is admissible because it was obtained by means sufficiently distinguishable to be purged of the primary taint.  See Brown v. Illinois, 422 U.S. 590, 602-604 (1975); Wong Sun v. United States, 371 U.S. 471, 488 (1963).  Even "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality."  New York v. Harris, 495 U.S. 14, 19 (1990).

It is incumbent upon the government to purge the illegality's taint.  The burden is a "heavy" one.  United States v. Caro, 248 F.3d 1240, 1247 (10th Cir. 2001); United States v. Gregory, 79 F.3d 973, 979 (10th Cir. 1996).  To determine whether the government has met that heavy burden, a court must examine the three factors applied in Brown v. Illinois:  (i) temporal proximity between the arrest and the evidence at issue; (ii) the presence of intervening circumstances; and (iii) particularly, the purpose and flagrancy of the police misconduct.  See Brown v. Illinois, 422 U.S. at 603 (citing Wong Sun v. United States, 371 U.S. at 491); United States v. Gregory, 79 F.3d at 979.

Fingerprint evidence obtained from an illegal arrest may be excluded under the Fourth Amendment.  In Davis v. Mississippi, 394 U.S. 721 (1969), a defendant appealed his conviction for

rape.  See id. at 722.  A rape occurred, and the only description given by the victim was that "her assailant . . . was a Negro youth."  Id.  The police of Meridian, Mississippi conducted a dragnet, detaining at least twenty-four African-American youths, without warrants, to briefly question and fingerprint them, after which they were released without charge.  See id.  The police also interrogated between forty and fifty African American youths at police headquarters, at school, or on the street.  See id.  Eventually, the defendant was brought in, and released after questioning and fingerprinting.  See id.  He was later detained and confined overnight without a warrant or probable cause, and the police took from him a second set of fingerprints.  See id. at 723.  The Supreme Court held that "[d]etentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment."  Id. at 727.  The Supreme Court noted "it [was] clear that no attempt was made here to employ procedures which might comply with the requirements of the Fourth Amendment . . . ."  Id. at 728. See United States v. Olivares-Rangel, 458 F.3d  1104, 1112 (10th Cir. 2006)(holding that I.N.S. v. Lopez-Mendoza "refers only to jurisdictional challenges to the admissibility of identity-related evidence."); United States v. Guevara-Martinez, 262 F.3d 751, 755 (8th Cir. 2001)(holding that fingerprints obtained from an undocumented person by officers that exploited his unlawful detention were excludable).

In United States v. Olivares-Rangel, the Tenth Circuit examined a district court's exclusion of a defendant's fingerprints, statements, and content of his INS file based upon illegality of the defendant's seizure.  See 458 F.3d at 1105.  The United States did not contest the seizure's illegality, and instead contended that I.N.S. v. Lopez-Mendoza, 468 U.S. 1032 (1984), "foreclose[d] the possibility of suppressing any evidence of identity in a criminal case."  United States v. Olivares-Rangel, 458 F.3d at 1105.  The Tenth Circuit concluded that I.N.S. v. Lopez-Mendoza did not preclude suppression of identity-related evidence.  See United States v. Olivares-Rangel, 458 F.3d

at 1112.  The Tenth Circuit noted that "there [was] a factual nexus between the illegal conduct and

the evidence in question (fingerprints)."  Id.  The Tenth Circuit explained:

> Nevertheless, we distinguish between fingerprints that are obtained as a result of an
> unconstitutional governmental investigation and fingerprint evidence that is instead
> obtained merely as part of a routine booking procedure.  In doing so, we hold that
> fingerprints are administratively taken in conjunction with an arrest for the purpose
> of simply ascertaining or confirming the identity of the person arrested and routinely
> determining the outstanding warrants unrelated to the unlawful arrest that are not
> suppressible.

Id.  The Tenth Circuit reversed and remanded on that issue, "because the factual record . . . [was]

insufficient to determine whether Defendant's unconstitutional arrest was purposefully exploited in

order to develop critical evidence of criminal conduct to be used against Defendant."  Id.  The Tenth

Circuit summarized: "Accordingly, although [INS v.]Lopez-Mendoza does not automatically exempt

all fingerprint evidence from application of the Wong Sun[v. United States] doctrine, application

of that rule indicates that fingerprints taken as part of a routine booking procedure following an

arrest later determined to be illegal ordinarily will not be poisoned fruit of an illegal arrest and

should not be suppressed."  United States v. Olivares-Rangel, 458 F.3d at 1113-14.  The Tenth

Circuit interprets cases such as Davis v. Mississippi "as requiring the suppression of fingerprint

evidence only when the illegal arrest was for the purpose of obtaining fingerprints without a warrant

or probable cause."  United States v. Olivares-Rangel, 458 F.3d at 1114.

The United States Court of Appeals for the Eighth Circuit found it significant in United

States v. Guevara-Martinez that "[t]he government offered no evidence that the fingerprints were

obtained as a matter of course through routine booking procedures, rather than for the purpose of

assisting the INS investigation."  262 F.3d at 756.  The Eighth Circuit also rejected the United States'

argument "that a set of untainted fingerprints can be obtained in the civil deportation proceedings

that [the defendant] will inevitably face.  Since [the defendant] can be recharged using the new set

of fingerprints, the government asks us to ignore its use of tainted evidence in this case.  We decline

. . . ."  Id.  See United States v. Oscar-Torres, 507 F.3d at 230-31 (noting a circuit split on the issue

of whether fingerprints are suppressible in light of I.N.S. V. Lopez-Mendoza, 468 U.S. at 1039, and

acknowledging that the Tenth Circuit interprets I.N.S. V. Lopez-Mendoza "as merely reiterating [a]

long-standing jurisdictional rule" and holding that I.N.S. V. Lopez-Mendoza "does not prohibit

suppression of evidence of a defendant's identity.")(citing United States v. Olivares-Rangel, 458

F.3d  at 1106 and United States v. Guevara-Martinez, 262-F.3d at 754-55).

    **E.    SELECTIVE LAW ENFORCEMENT**.

    A defendant raising a claim of selective law enforcement must show that a discriminatory

purpose motived the law-enforcement officer and that their actions had a discriminating effect.  See

United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006).   To satisfy the

discriminating effect element, a defendant must show that a similarly situated individual of another

race could have been, but was not, stopped or arrested for the offense for which the defendant was

stopped or arrested.   See id.   The discriminatory purpose element requires a showing that a

discriminatory intent was a "motivating factor" in the decision to enforce the law against the

particular defendant.  Id.  The standard for proof of a selective law-enforcement claim is demanding.

See id.

    **FIFTH AMENDMENT RIGHTS**

    In Johnson v. Morel, 876 F.2d 477 (5th Cir. 1989), abrogated on other grounds by Harper

v. Harris County, 21 F.3d 597 (5th Cir. 1994), the plaintiff alleged an officer used excessive force

and violated his constitutional rights.   See 876 F.2d at 478.   The plaintiff alleged that the officer

"humiliated and harassed him, and that the insults and harassment were explicitly racist."  Johnson

v. Morel, 876 F.2d at 479.  The United States Court of Appeals for the Fifth Circuit overruled the

district court's decision to grant summary judgment in the plaintiff's 42 U.S.C. §1983 case.  See Johnson v. Morel, 876 F.2d at 478.  Moya-Matute contends that Johnson v. Morel stands for the proposition that "[t]he stopping, questioning, detaining, frisking, arresting, and searching of individuals based solely upon racial and ethnic appearance violates the Fifth Amendment."  Motion at 3 (citing Johnson v. Morel, 876 F.2d at 479).  The United States contends that Johnson v. Morel does not stand for this proposition.  See Response at 6-7 n. 4.  The plaintiff in Johnson v. Morel raised claims only under the Fourth and Fourteenth Amendments for equal protection and excessive use of force.  See 876 F.2d at 478.  Johnson v. Morel did not discuss the Fifth Amendment because it was not at issue in that case.  The Fifth Circuit did not "pass on the truth of [the plaintiff's] claims.  Nor did [it] express any opinion on the merit of [the plaintiff]'s claims.  The elimination of racial discrimination remains at the heart of the Fourteenth Amendment.  The Constitution does not tolerate intentional police harassment of racial minorities."  Id. at 479.

## ANALYSIS

The Court finds that the encounter between Moya-Matute and the agents was a consensual encounter, but that the consensual encounter ripened into an investigative detention.  During the consensual encounter, Moya-Matute supplied the agents with information to give them probable cause to arrest him.  Moya-Matute's fingerprints are not suppressible, because they were obtained as part of the agents' routine booking procedure and the agents' arrest of Moya-Matute was legal and not for the purpose of obtaining his fingerprints.

## I.   KNOLL AND UNDERDOWN DID NOT APPROACH MOYA-MATUTE SOLELY BECAUSE HE WAS HISPANIC.

Moya-Matute contends that the agents approached him because he "looked Spanish and spoke Spanish."  Defendant's suppression motion at 4.  Moya-Matute essentially raises a claim of

selective law enforcement.  See Response at 7.  He has not, however, provided the Court with a factual basis for his argument.

Knoll and Underdown approached Moya-Matute because it was the agents' practice to approach everyone or at least as many people as possible.  See Tr. at 14:7 (Underdown).  Consistent with their practice, Knoll and Underdown did not approach Moya-Matute because of his ethnic or racial appearance, or because he spoke Spanish.  See Tr. at 27:3-4 (Underdown)(testifying that Underdown and Knoll approached Moya-Matute because he was in the bus station, and they were trying to encounter as many people as they could.).  United States v. Brignoni-Ponce does not bar their approach; Knoll and Underdown approached Moya-Matute and engaged in a consensual encounter because it was their practice to speak to everyone, and did not approach Moya-Matute because of his apparent ancestry.  See 422 U.S. at 866 (holding that it is a violation of the Fourth Amendment to stop a vehicle near the international border and question the occupants about their immigration status and citizenship where the only ground for suspicion that the occupants of the vehicle are aliens is the occupants' apparent Mexican ancestry).

Moya-Matute has not met the demanding standard of proof for his contention of selective law enforcement, because he has not proven that the agents were motivated by a discriminating purpose and has not demonstrated that the agents' actions had a discriminatory effect.  See United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006).  Moya-Matute has not proven that a similarly situated individual of another race could have been, but was not, stopped or arrested for the offense for which he was stopped or arrested.  See id.

## II.   THERE IS NO HEIGHTENED FOURTH AMENDMENT SCRUTINY BECAUSE THE ENCOUNTER OCCURRED IN ALBUQUERQUE RATHER THAN IN LAS CRUCES.

Routine, warrantless searches at fixed, permanent border checkpoints are exceptions to the

warrant requirement of the Fourth Amendment, and are excused as administrative searches, despite being conducted without reasonable suspicion or probable cause.  See Almeida-Sanchez v. United States, 413 U.S. 266, 272 (1973); United States v. Najar, 451 F.3d 710, 714 n. 1 (D.N.M. 2006). In contrast, the Supreme Court was "unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving-patrol stops."  United States v. Brignoni-Ponce, 422 U.S. at 882.  Immigration agents must have reasonable suspicion, based on specific, articulable facts, to subject persons to investigative detentions.  See 8 C.F.R. § 287.8(b)(2).  Agents are authorized to arrest when they have "reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States."  8 C.F.R. § 287.8(c)(2)(i).  See United States v. Snow, 82 F.3d 935, 942 (10th Cir. 1996)(internal quotations omitted)( "To determine if probable cause exists, a court looks to "whether at that moment the facts and circumstances within [the officer's]  knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [officer] in believing that the petitioner had committed or was committing an offense.").

Moya-Matute suggests that Fourth Amendment scrutiny is heightened  because this incident occurred, and he was arrested, more than one-hundred miles from the international border.  See Motion at 4-5.  He contends that border patrol agents' authority to patrol is limited if more than one-hundred miles from the border.  See id. at 4 (contending that "[m]oreover, the border patrol agents' authority to patrol is limited if more than 100 miles from the border.")(citing 8 U.S.C. § 1357(a)(3) (allowing agents to engage in warrantless searches "within a reasonable distance from any external boundary of the United States" of "any railway car, aircraft, conveyance, or vehicle . . . but not dwellings")); 8 C.F.R. § 287.1(2)(stating that reasonable distance means "distances not exceeding 100 air miles from any external boundary of the United States . . . .")).

When agents act outside of 100 air miles from the border, they are constrained by the Fourth Amendment.  See 8 C.F.R. § 287.8(b)(2)(noting that agents must have reasonable suspicion, based on specific, articulable facts, to subject persons to investigative detentions); 8 C.F.R. § 287.8(c)(2)(i)(stating that agents are only authorized to arrest when they have "reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States." ); United States v. Brignoni-Ponce, 422 U.S. at 882 (noting that roving patrol agents must have a reasonable suspicion to stop vehicles).  The Court finds that the Fourth Amendment standards govern Moya-Matute's interactions with the agents.

## III.    THE INITIAL ENCOUNTER BETWEEN THE IMMIGRATION AGENTS AND MOYA-MATUTE WAS CONSENSUAL.

There is a dispute about how Knoll and Underdown approached Moya-Matute.  Moya-Matute contends that the border patrol agents approached him from either side while he stood in line at a snack-stand in a busy bus terminal, and that they essentially blocked his egress.  See Motion at 4.  Moya-Matute contends that, at that point, he was "immediately seized." Id.  On the other hand, the United States contends that Knoll and Underdown approached Moya-Matute inside the bus terminal like they did several other passengers.  See Response, at 6 (quoting Florida v. Bostick, 501 U.S. at 434 ("There is no doubt that if the same encounter had taken place before [the defendant] boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure.")).

Moya-Matute criticizes Knolls' report of the incident because it does not delineate the agents' reasonable suspicion for approaching Moya-Matute.  See Motion at 4-5.  He contends that, once they encountered Moya-Matute, the agents had to have reasonable suspicion  for approaching him, blocking his path, and seizing him.  See Motion at 5.  Moya-Matute contends that, absent reasonable suspicion that he was  violating immigration laws, the agents did not have legal

justification to seize and question him about his alienage.  See Motion at 4.

Although Moya-Matute may have subjectively felt like he was not free to leave, a person is seized within the meaning of the Fourth Amendment if a reasonable person would not have felt free to terminate the encounter.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." United States v. Mendenhall, 446 U.S. at 552 (quoting Terry v. Ohio, 392 U.S. at 19). "As long as the person to whom questions are put remains free to disregard the questions and walk away there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification."  United States v. Mendenhall, 446 U.S. at 554.

The Tenth Circuit has identified several factors that are relevant in determining whether a person has been seized within the meaning of the Fourth Amendment:

> [i]  The threatening presence of several officers; [ii] the brandishing of a weapon by an officer; [iii] some physical touching by an officer; [iv] the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; [v] prolonged retention of a person's personal effects; [vi] a request to accompany the officer to the station; [vii] interaction in a nonpublic place or a small, enclosed space; [viii] and absence of other members of the public.

Jones v. Hunt, 410 F.3d at 1226 (internal quotations omitted).  Immigration agents may engage in consensual encounters with aliens just as police officers can engage in consensual encounters with any other person.  See 8 C.F.R.  287.8(b)(1) (stating that  "[a]n immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away.").

The agents did not confront Moya-Matute.  Knoll and Underdown were the only agents to speak with Moya-Matute, and there is no indication that they did so by brandishing weapons or speaking in a threatening manner.   Knoll and Underdown did not physically restrain Moya-Matute.

See Tr. at 25:21 (Underdown)(stating that Knoll was approximately three feet away from Moya-Matute); id. at Tr. at 26:14-17 (Brawley & Underdown)(estimating that Underdown was approximately six feet from Moya-Matute).

Underdown testified that he could not recall what exactly was said during the initial encounter between Knoll and Moya-Matute. See Tr. at 53:1-4 (Underdown). Underdown could not understand Knoll's first couple questions in Spanish to Moya-Matute. See Tr. at 53:11-12 (Underdown)("The words I pick up are immigration papers or places they're from, stuff like that."). Although Underdown was unable to testify what the exact conversation between Knoll and Moya-Matute was, because Knoll and Moya-Matute were speaking in Spanish, and that "took [Underdown] a little out of the picture," Tr. at 27:10-11 (Underdown), Moya-Matute concedes that Knoll used a normal tone when he spoke with him. See Tr. at 69:1-3 (Johnson & Moya-Matute). Moreover, Underdown stated that he "can still understand general stuff in Spanish." Tr. at 27:10-11 (Underdown). Underdown was able to testify that Moya-Matute claimed he was from Honduras, that he did not have his papers on him, and that they were in his bag outside. See Tr. at 27:24-28:1-2.

Even some of Moya-Matute's testimony supports the Court's finding that the initial encounter was consensual. Moya-Matute testified that Knoll came up to him, identified himself as an immigration agent, and asked to see Moya-Matute's papers to be in the country legally. See Tr. at 66:1-6 (Moya-Matute & Johnson). Moya-Matute did not know how close Underwood was standing to him, but he could have touched Knoll, who was about an arm's length away. See Tr. at 66:14-20 (Johnson & Moya-Matute). Moya-Matute testified Underwood was about an arm's length away from him as well. See Tr. at 67:1-4 (Johnson & Moya-Matute).

Moya-Matute testified that he could not get away from the agents because they were

blocking his exit, so he could not go anywhere. See Tr. at 67:5-7 (Johnson & Moya-Matute). Moya-Matute testified he did not feel like he could just walk away from them when he was approached by Underdown and Knoll, because they were blocking his exit. See Tr. at 68:18-25 (Johnson & Moya-Matute). The Court has already rejected Moya-Matute's version of events and adopted Underdown's.

Moya-Matute also testified that Knoll never greeted him and never asked permission to speak with him. See Tr. at 67:18-22 (Johnson & Moya-Matute). An officer does not, however, have to inform the person approached that he or she may refuse to answer questions for the encounter to be consensual. See United States v. Little, 18 F.3d 1505 (noting that there is "no per se rule" requiring that officers inform the encountered individual that she or he may refuse to answer questions). And there is nothing in the record which suggests that the agents indicated to Moya-Matute that he was not free to leave.

The record, as the Court has found it, reflects that Knoll did no more than converse with Moya-Matute. The agents did not violate the Fourth Amendment in this initial consensual encounter with Moya-Matute. Accordingly, the Court holds that Knoll and Underdown did not violate Moya-Matute's constitutional rights when they approached him and Knoll began to converse with him.

The Tenth Circuit has noted that the categories of consensual encounter, investigative detention, and arrest

> are not static. A consensual encounter may escalate into an investigative detention. An investigative detention may escalate into a full-blown arrest or it may de-escalate into a consensual encounter. A reviewing court must analyze each stage of the encounter, ensuring that the requisite level of suspicion or cause is present at each stage.

United States v. Shareef, 100 F.3d at 1500. Accordingly, the Court next analyzes whether the agents had probable cause to arrest Moya-Matute.

## IV.    THE CONSENSUAL ENCOUNTER ENDED WHEN KNOLL SEIZED MOYA-MATUTE BY PHYSICALLY RESTRAINING HIM.

Moya-Matute correctly contends that Knoll and Underdown needed at least reasonable suspicion to seize him.  See Motion at 2. The United States does not concede, but also does not dispute, that the immigration agents detained Moya-Matute while they accompanied him toward the bus so that he could retrieve the papers showing that he was legally in the United States.  See Response at 8 (stating that, "[a]ssuming for the purpose of argument that [Moya-Matute] was detained by the immigration agents while they accompanied him towards the bus so that he could retrieve the papers showing he was legally in the United States," the validity of the detention was governed by Terry v. Ohio).  Moreover, the Court believes, that once Knoll put his hands on Moya-Matute in a way that physically restrained the Defendant, a seizure took place.

Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  United States v. Mendenhall, 446 U.S. 544, 552 (1980)(quoting Terry v. Ohio, 392 U.S. at 19; United States v. Harris, 313 F.3d at 1235(noting that "the Defendant was not seized for purposes of the Fourth Amendment until [the officer] implemented physical force by removing Defendant's hands from his pockets and escorting him to the police car.").  Knoll and Underdown used physical force on Moya-Matute's person to compel him to accompany them outside where he had told them his immigration papers were located.  See Tr. at 29:8-9 (Underdown) (testifying that Knoll escorted Moya-Matute outside by either his belt or his arm.); id. at 68:13-15 (Johnson & Moya-Matute)(testifying that, once he told Knoll his immigration papers were on the bus, Knoll grabbed him by his belt loop and took him outside while Underdown walked next to him).  Thus, by the time that seizure took place, the agents needed at least reasonable suspicion.  Any consensual encounter ended by that point.

## V.   THE AGENTS DID NOT NEED REASONABLE SUSPICION TO QUESTION MOYA-MATUTE ABOUT HIS ALIENAGE BECAUSE THEIR ENCOUNTER WITH HIM WAS CONSENSUAL.

Moya-Matute contends that, absent reasonable suspicion that he was violating immigration law, Knoll and Underdown could not question him about his alienage.  See Motion at 3.  The United States responds that "Knoll and Underdown had particular and objective facts justifying [Moya-Matute's] brief detention while [they] accompanied him towards the bus," because, "[b]ased on their training and experience, they knew the bus station to be a staging area for illegal aliens."  Response at 9.  The United States argues that Knoll and Underdown "realized [Moya-Matute] was not a United States citizen after they began speaking with him."  Id.  The United States contends that Knoll and Underdown knew that Moya-Matute was not a United States citizen "because [Moya-Matute] either told them he was from Honduras or could not answer their simple questions, asked in Spanish, about where he was from, where he was born, and where he went to school."  Id.

The Court does not believe it was necessary for the agents to have had reasonable suspicion during the consensual encounter to ask the questions that they did.  Although the Court finds Knoll's first question to Moya-Matute was: "Where are your papers," the Court does not believe that was improper if the encounter was consensual.  While it may be offensive to think of police officers asking people at a bus station where their papers are, as long as the encounter is consensual, the Constitution does not put a limitation on what the police ask in the conversation.  Thus, taking, as the Court has, Moya-Matute's version of Knoll's initial statement or statements, the encounter remained consensual and his questions permissible.

The United States did not adduce sufficient evidence from Underdown regarding what Knoll said to, and asked of, Moya-Matute in the first couple sentences of their conversation.  Knoll initially spoke English to Moya-Matute, but then Knoll spoke to Moya-Matute in Spanish.  See Tr.

at 27:8-9 (Underdown).  Underdown could not understand Knoll's first couple questions in Spanish to Moya-Matute.  See Tr. at 53:11-12 (Underdown).

Underdown also testified that he could not recall what exactly was said during the initial encounter between Knoll and Moya-Matute.  See Tr. at 53:1-4 (Underdown).  Underdown admitted that, because Knoll and Moya-Matute were speaking in Spanish, that "took [Underdown] a little out of the picture, but [he] can still understand general stuff in Spanish."  Tr. at 27:10-11 (Underdown).  Underdown admitted he could not understand or know exactly what Knoll and Moya-Matute were saying.  See Tr. at 45:7-10 (Johnson & Underdown).  Underdown admitted he did not understand enough Spanish at the time that Knoll began to talk to Moya-Matute to determine whether Knoll asked Moya-Matute to see his papers and whether Moya-Matute said he was from Honduras.  See Tr. at 94:20-25 (Court & Underdown).  "The words I pick up are immigration papers or places they're from, stuff like that."  Id.

The first thing that Underdown could remember was that Moya-Matute said he was "from Honduras."  Tr. at 53:16-20 (Court & Underdown).  The Court gave some thought to whether it could reasonable infer, from that statement, that Knoll asked Moya-Matute where he was from. In the end, however, the Court concluded that there was insufficient evidence to find that Knoll asked that question at the beginning of the encounter with Moya-Matute.

The Court is comfortable, however, finding that Moya-Matute told Knoll he was "from Honduras."  Tr. at 53:16-20 (Court & Underdown).  The Court recognizes that Moya-Matute testified that he never told Knoll nor Underdown that he was from Honduras,  see Tr. at 79:2-3 (Johnson & Moya-Matute), and testified that, once Knoll and Underdown took him to the immigration office they asked him for identification and he gave them his license, and then they realized he was from Honduras, see Tr. at 79:4-7 (Moya-Matute).  The Court does not find that part

-48-

of Moya-Matute's story to be credible.  The Court finds that Moya-Matute said he was from Honduras before they left the bus station.

Because Underdown was unable to testify with precision what the first few statements in Knoll and Moya-Matute's conversation were about, the Court has insufficient evidence in the record that Moya-Matute "could not answer [Knoll's] simple questions, asked in Spanish about where he was from, where he was born, and where he went to school."  Response at 9.  The United States contends that, because Knoll and Underdown encounter thousands of illegal aliens each year, it is understandable that Underdown failed to recall exactly what Moya-Matute said on April 5, 2007. See Response at 4 ("[A]s INS agents arrest over one million deportable aliens a year and the arrests often occur in crowded and confused circumstances, they cannot be expected to recall the precise basis for every detention.")(citing INS v. Lopez-Mendoza, 468 U.S. at 1049).  That problem may be true, but the reality is that Underdown was also unable to comprehend, recall, or hear at least the beginning of what Moya-Matute said to Knoll on April 5, 2007 because Underdown is not fluent in Spanish and/or could not hear that part of their conversation.  See Tr. at 53:1-4 (Underdown); id. at 53:11-12 (Underdown); id. at 94:20-25 (Court & Underdown); id. at 45:7-10 (Johnson & Underdown).  In any case, INS v. Lopez-Mendoza does not dispense with the Fourth Amendment's requirement that officers articulate a particular basis to subject persons to investigative detentions:

> Immigration officers apprehend over one million deportable aliens in this country every year.  A single agent may arrest many illegal aliens every day.  Although the investigatory burden does not justify the commission of constitutional violations, the officers cannot be expected to compile elaborate, contemporaneous written reports detailing the circumstances of every arrest.

468 U.S. at 1049 (internal citations omitted)(emphasis added).

Crediting Underdown's testimony that Moya-Matute said he was from Honduras, and that Underdown understood Moya-Matute when he told Knoll that information, does not, however,

automatically mean Moya-Matute was required to have immigration papers on his person.  See 8

U.S.C. § 1304(e) (stating that "[e]very alien, eighteen years of age and over, shall at all times carry

with him and have in his personal possession any certificate of alien registration or alien registration

receipt card . . . . Any alien who fails to comply with the provision of this subsection shall be guilty

of a misdemeanor.")(emphasis added); 8 U.S.C. § 1101 ("The term 'alien' means any person not a

citizen or national of the United States."). The Court acknowledges the fact that Moya-Matute spoke

Spanish and was from Honduras, alone, may not furnish Underdown and Knoll with reasonable

suspicion to subject him to an investigative detention.  See United States v. Brignoni-Ponce, 422

U.S. at 881.  The Court believes, however, that there are more facts here which gave Knoll and

Underdown reasonable suspicion and probable cause.  Here, Moya-Matute's statements about his

papers gave the agents reasonable suspicion and probable cause that he was breaking the federal

immigration laws.

     The agents' encounter with Moya-Matute, however, is distinct from the situation in United

States v. Brignoni-Ponce.  In United States v. Brignoni-Ponce, the Supreme Court of the United

States announced its unwillingness "to let the Border Patrol dispense entirely with the requirement

that officers must have a reasonable suspicion to justify roving-patrol stops."  Id. at 882.  The

Supreme Court was concerned that, "if [it] approved the [United States'] position . . . Border Patrol

officers could stop motorists at random for questioning, day or night, anywhere within 100 air miles

of the 2,000-mile border, on a city street, a busy highway, or a desert road, without any reason to

suspect that they have violated any law."  Id.  at 883.  The Supreme Court was "not convinced that

the legitimate needs of law enforcement require this degree of interference with lawful traffic."  Id.

Moya-Matute's encounter, however,  with the agents at the bus station was on foot -- that is there

was no traffic stop involved, unlike the stop that concerned the Supreme Court in United States v.

Brignoni-Ponce.   Further, the initial encounter between Moya-Matute and the agents was a consensual one.  The traffic stop in Brignoni-Ponce cannot be characterized as consensual.

Moreover, there is no Fourth Amendment prescription regarding the content of officers' questions during a consensual encounter, so long as the officers' questions are not coercive.  See United States v. Torres-Guevara, 147 F.3d 1261, 1265 (10th Cir. 1998)(internal quotations and citations omitted)(noting that, "[a]lthough accusatory, persistent, and intrusive questioning may turn an otherwise voluntary encounter into a coercive one, this is true only if the officers convey the message that compliance is required.");  United States v. Ringold, 335 F.3d 1168, 1174 (10th Cir. 2003)(internal quotations omitted)(noting that, "the mere fact that officers ask incriminating questions is not relevant to the totality-of-the-circumstances inquiry -- what matters instead is the manner in which such questions were posed.").  Moya-Matute told the agents he had papers before he was physically restrained by Knoll.  See Tr. at 68:13-15 (Johnson & Moya-Matute)("Moya-Matute testified that, once he told Knoll his immigration papers were on the bus, Knoll grabbed him by his belt loop and took him outside while Underdown walked next to him.").  Moya-Matute also testified, however, that he told Knoll his immigration papers were on the bus because he was embarrassed by everyone looking at him.  See Tr. at 68:2-5 (Johnson & Moya-Matute).  Underdown testified that Moya-Matute asserted that he was from Honduras, that he did not have his papers on him, and that his papers  were in his bag outside.  See Tr. at 27:24-28:1-2 (Underdown).  The Court has concluded that all these statements were made in the context of a consensual encounter.

The Court believes that, once Moya-Matute told the agents he was from Honduras and did not have his immigration papers on his person, he gave sufficient information for them to have probable cause to arrest him under 8 U.S.C. § 1304(e).  See 8 U.S.C. § 1304(e) ("Every alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession

-51-

any certificate of alien registration or alien registration receipt card issued to him pursuant to subsection (d) of this section. Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both."). "[P]robable cause must exist at the moment of the arrest." United States v. Hansen, 652 F.2d 1374, 1388 (10th Cir. 1981). Moya-Matute furnished the agents with that probable cause once he admitted he did not have any papers on his person. "Probable cause is a matter of probability, not certainty. Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Because a fair probability is all the law demands, [the Court] do[es] not require greater proof -- certainly not conclusive proof -- of any particular factor establishing probable cause." United States v. Stephenson, 452 F.3d 1173, 1178 (10th Cir. 2006).

Moya-Matute's counsel contends that, when Moya-Matute said he did not have papers, that fact did not establish probable cause, because "he could have been a naturalized citizen [and] as a naturalized citizen he's not required to carry documentation of his status in the United States." Tr. at 116:18-25 (Johnson). The agents, however, are not required to have conclusive proof that Moya-Matute was undocumented -- they only needed a fair probability that he was undocumented. A reasonable officer could conclude that Moya-Matute's response that he was from Honduras, had papers, and that the papers were on the bus indicated that Moya-Matute was not a naturalized citizen, who did not have to carry papers, but was an alien from Honduras who had papers and was carrying them, but left them on the bus. The Court finds that, under the facts and circumstances of this case, the information the agents possessed gave them probable cause to arrest Moya-Matute because they had a "fair probability" that he was undocumented and was required to have immigration papers on his person under 8 U.S.C. § 1304 (e). United States v. Stephenson, 452 F.3d

at 1178.

The United States additionally contends that  it was reasonable for Knoll and Underdown to conclude that Moya-Matute was a flight risk and arrest him without a warrant under 8 C.F.R. 287.8(c)(2).  See Response at 11-12.  8 C.F.R. 287.8(c)(2) provides that:

> (i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States.

> (ii)  A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.

8 C.F.R. 287.8(c)(2)(i) and (ii).  Although it appears a warrantless arrest is justified under 8 C.F.R. 287.8(c)(2)(ii) if the agent is concerned that the person will likely escape before a warrant can be obtained, the agent must have at least probable cause, as described by 8 C.F.R. 287.8(c)(2)(i) to arrest.  Thus, the United States' contention that Underdown and Knoll were concerned that Moya-Matute was a flight risk is irrelevant to whether the agents had probable cause to arrest, and would only be relevant to an explanation of why the agents did not first seek a warrant for Moya-Matute's arrest.

## VI.    THE COURT WILL NOT SUPPRESS MOYA-MATUTE'S FINGERPRINTS, BECAUSE THEY WERE TAKEN DURING A ROUTINE BOOKING PROCEDURE.

Even if the agents unconstitutionally asked Moya-Matute about his alienage or lacked probable cause to arrest him, the Court would not suppress his fingerprints.   "To suppress evidence as the fruit of [an] unlawful detention, [the defendant] must make two showings: [i] that the detention did violate his Fourth Amendment rights; and [ii] that there is a factual nexus between the illegality and the challenged evidence."   United States v. DeLuca, 269 F.3d at 1132 (internal quotations omitted). Moya-Matute contends that the Court should suppress the evidence of his

identity because the agents obtained it in violation of the United States Constitution, and therefore, the exclusionary remedy applies.  <u>See</u> Motion at 5-8. Moya-Matute contends that the agents "had no knowledge of [his] identity and had no reason to approach or seize him before the unlawful encounter."  Motion at 8.  Moya-Matute further contends that "[a]ll of the evidence against [him] was tainted by the unconstitutional conduct of the agents and this Court should exclude it."  <u>Id.</u>  The United States' response is "[t]he arrest of the Defendant on April 5, 2007 was proper, and the exclusionary rule should not apply."  Response at 12.

Assuming that Moya-Matute could show that the agents' detention of him violated his Fourth Amendment rights, that there was a factual nexus between the illegal detention and his fingerprints, and that Moya-Matute has made those showings, then the United States must prove that the evidence Moya-Matute seeks to suppress "is not fruit of the poisonous tree, either by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."  <u>United States v. DeLuca</u>, 269 F.3d at 1132 (internal quotations omitted).  The Tenth Circuit explained in <u>United States v. Olivares-Rangel</u>, however, that "although [INS v.]<u>Lopez-Mendoza</u> does not automatically exempt all fingerprint evidence from application of the <u>Wong Sun</u>[<u>v. United States</u>] doctrine, application of that rule indicates that fingerprints taken as part of a routine booking procedure following an arrest later determined to be illegal ordinarily will not be poisoned fruit of an illegal arrest and should not be suppressed."  <u>United States v. Olivares-Rangel</u>, 458 F.3d at 1113-14. The court therefore should suppress fingerprint evidence obtained as part of a normal booking procedure only if "the illegal arrest was for the purpose of obtaining fingerprints without a warrant or probable cause."  <u>United States v. Olivares-Rangel</u>, 458 F.3d at 1114.  <u>See Davis v. Mississippi</u>, 394 U.S. at 727 (holding that"[d]etentions for the sole purpose of obtaining fingerprints are no less subject to

the constraints of the Fourth Amendment.").

At the hearing on this matter, Underdown testified that, at the Border Patrol office, Knoll obtained Moya-Matute's biographical information and got the fingerprint machine ready.  See Tr. at 32:1-6 (Brawley & Underdown).  Underdown testified that Moya-Matute's name and fingerprints were run through criminal and immigration databases to see if the Border Patrol had encountered him, or if he had a prior criminal history in the United States.  See Tr. at 32:10-21 (Brawley & Underdown).  Underdown further testified that, if Moya-Matute had refused to be fingerprinted, the immigration and criminal databases checked would have given the agents Moya-Matute's name and date of birth.  See Tr. at 32:22-33:3 (Brawley & Underdown).

Underdown testified that such a procedure is usually what is done in the course of his duties when he makes an arrest.  See Tr. at 32:7-9 (Brawley & Underdown).  Moya-Matute's fingerprints were obtained as part of the agents' normal booking procedures.  His arrest was lawful and, in any case, was not for the purpose of obtaining his fingerprints, and the Court will thus not suppress his fingerprints as fruit of the illegal arrest.

## VII.   KNOLL AND UNDERDOWN DID NOT VIOLATE MOYA-MATUTE'S FIFTH AMENDMENT RIGHTS.

None of the behavior presented in Johnson v. Morel is present in this case.  See 876 F.2d at 479 (noting that the plaintiff alleged the police officer "humiliated and harassed him, and that the insults and harassment were explicitly racist."). While there are issues whether the agents had probable cause, the agents did not do anything other than arrest Moya-Matute for being an undocumented person.  There is no procedural due process violation, and the agents' conduct does not shock the Court's conscience. See Ward v. Anderson, 494 F.3d 929, 937 (10th Cir. 2007)("The ultimate standard for assessing an alleged violation of substantive due process is whether the

challenged government action shocks the conscience of federal judges.")(internal quotations omitted).   To the extent Moya-Matute alleges that Knoll and Underdown violated his Fifth Amendment rights, no such violation occurred.

**IT IS ORDERED** that the Defendant's Motion to Suppress is denied.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Larry Gomez
  Acting United States Attorney
James Tierney
Kimberly A. Brawley
  Assistant United States Attorneys
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Erlinda O. Johnson
Albuquerque, New Mexico

    *Attorney for the Defendant*